Mr. McDaniel's lawsuit against the state of Missouri should be dismissed by this court for two primary reasons. First, it is barred by sovereign immunity. And second, it is outside the bounds of Article III jurisdiction because Mr. McDaniel does not have standing to bring the suit and because now that Director Precythe is the director of the Department of Corrections, the case is now moot. Beginning with the sovereign immunity question, this case is nearly, very nearly on all fours with below. A case in which this court held that the ministerial implementation of a statute is not an enforcement action. That case is very clear following Ex parte Young that enforcement requires some sort of civil or criminal proceeding, either instituted or joined by the named defendant, to fall within Ex parte Young's requirement that there be, you know, some sort of enforcement, either about to commence, commenced, or threatened commencement. In this case, there is no enforcement, just as there was no enforcement in below. Here, all the director does is what the director is required to do by statute, which is exercise her ministerial duty to send one invitation to the Missouri Attorney General to attend an execution and eight other invitations to reputable Missouri citizens, or I'm sorry, reputable citizens, to attend an execution. That is what Director Lombardi did in this case, and so that's very clearly outside of Ex parte Young's enforcement requirement, which means the case is, or I'm sorry, the suit is barred by sovereign immunity. Why do you say that Ex parte Young is an enforceable action? Supposedly, an official is acting unconstitutionally and harming another person, harming a citizen by acting unconstitutionally in the context of enforcement. Why couldn't the court have joined the official from continuing to act unconstitutionally? The court's question really is in a situation in which there is enforcement, where the state officer is taking some sort of action, civil or criminal, against the individual. In Ex parte Young, the United States Supreme Court explained that when an individual, you know, sovereign immunity didn't apply, when an individual in Ex parte Young, it was a state officer threatening to enforce a railroad rate scheme through criminal prosecution. I know that was an enforcement case, but I just want to remind you that it's limited to enforcement. Supposedly, the state was administering welfare benefits in a way that was unconstitutional, and I'm assuming you can say it was beneficiaries. Absolutely, and this court has done that before, but that's an enforcement action. Why is it an enforcement action when you say you can't discriminate in the distribution of benefits while the court's being enforced there? In that situation, there's an administrative regulatory scheme that the state has created with either in the state code of regulations or by statute in which the state has said, if you meet these criteria, we will, you will have a right or an interest in receiving these benefits. When the individual applies, that would be an administrative enforcement action, right? When the individual applies for those benefits and is denied for some improper or, you know, illicit purpose, that is an enforcement action taken against the person. And of course, that's not the facts that we have here. If there was some sort of program or some sort of established statutory or regulatory procedure that the director was participating in and the director said, you know, I'm going to use racial animus to deny all of these individuals, that would certainly present a different situation and one in which the court should look very closely at what was occurring. But in this case, that's simply not what occurred. But you know that's what occurred. You're talking about the principle of your art, which is that it's not an enforcement action. It's not an immunity. So the example is that's not an enforcement action. That's a way of looking at it. Maybe it's based on race or religion or something. I think you don't quite concede it, but you're saying it's very different and we should look hard, which is sort of a… Yes. That's a, that sort of racial animus with an express statement is not a sort of situation that I had considered. It is somewhat similar to the Ku Klux Klan case that's cited in the briefs in which the state of Missouri, you know, the adopt a highway sign. Yes. In that case, as distinct from this one, the state did concede that adopting a highway is a valuable government benefit. Here, of course, both Mr. McDaniel and the district court found that witnessing an execution is a valuable government benefit, which is not something the state of Missouri concedes here. But to return to the sovereign immunity question, that case, to be frank, would present grave concerns. Fortunately, not an issue that is implicated here. I think part of the court's difficulty or concern with the enforcement language derives from what I think the cases demonstrate, which is that since Ex parte Young has been decided, that exception has broadened. But in below, this court looked at Ex parte Young and very clearly found without an enforcement action, and there was none in below and there is none here, the case does not fall within the Ex parte Young exception and is therefore prohibited under sovereign immunity. But that's not to say an individual would be without remedy. Perhaps they could file a claim in state court where sovereign immunity rules are different. Let me ask you about mootness. You sent in, I think it was a pleading or a letter saying the new director had initiated some sort of legal review. Do you recall this? Yes, Your Honor. And the suggestion was there was going to be a legal review and then she might decide to set up a more formal procedure for the witness. That's right, Your Honor. Has anything happened on that front? I checked with the department last week in anticipation of that question. That review is ongoing. After speaking with the director and the members of the general counsel's office, it seems that they are in the process of making some changes to the application form. So there's no change at this time? It's still in the status quo? That's correct, Your Honor. How would the case be moot then if she has the same non-federal discretion that Lombardi has? And that's an excellent question, Your Honor. In Spumer, the main mootness case that we cite, there was no evidence in the record to show that the new prosecuting attorney would use his office sort of animated by the same racial animus that the prior occupant had. Here, Mr. McDaniel has pled based on one year, 12 months of activity, that Director Lombardi personally engaged in some sort of inappropriate viewpoint, or that there was a risk, rather, of inappropriate viewpoint discrimination. Here, there's no allegation that Director Preside has engaged in any of that sort of activity. So there's simply nothing. So he's going to come up and say, well, the same risk is here because she has the same discretion that Lombardi had. So if it's a risk argument, it's the same argument. Whether it has merit or not is a separate question. But in terms of mootness, it's the same situation, isn't it? It's not, because mootness has to, or I'm sorry, Article III jurisdiction has to exist at each stage in the litigation. Here, because there is a new director, and because what Mr. McDaniel, like the plaintiffs in Spumer, has pled, is that this particular individual has acted inappropriately. There must be some evidence or indication in the record, preferably in a complaint, I think is what the United States Supreme Court talks about, that the new occupant of the office would engage in this sort of same inappropriate illegal behavior. So you think he needs to go back and amend the complaint and say, well, there's the same risk under preside that there was under Lombardi? I think the court could, I'm sorry, Your Honor, I didn't mean to interrupt. It's a live case. It's not live now. I think that's correct. And that was the remedy in Spumer. The United States Supreme Court, I'm sorry, the officer was replaced during the pendency of certiorari, but after the Seventh Circuit's decision, the United States Supreme Court remanded the case back to the Seventh Circuit to make a determination. In the first instance, as to whether or not the plaintiff there was going to allege that the new occupant of the office would engage in the same racial animus. Here, I think the court could, if it were inclined, remand the case back to the district court for a special fact-finding or evidentiary hearing on whether or not Mr. McDaniel believes and has facts to plead, well-pled facts, that Director Preside would engage in that same activity. Okay. Thank you for your answer. I think this is a, this is a, the Spumer, I sort of refer to it as the Spumer rule. It is a different articulation of sort of the mootness requirements in Article III. I think it is a very separate and sort of factually distinct scenario. Normally, the right answer, if a case did not have a live controversy like in Ringo, would be for this court to say, it's simply dismissed. Here, I think the right answer, if the court believes that it is moot, would be to remand for Mr. McDaniel to have an opportunity to have that hearing. Okay. How about standing? If McDaniel's claim has merit, that is, he can show that there has been a viewpoint of discrimination, and that he was excluded because of his viewpoint, why isn't he an injury? He's a journalist or whatever his profession is, and it's important to him to witness an execution. Why isn't that an injury? Your Honor, standing requires an injury in fact, which is, which requires the invasion of a legally protected interest. In this case, Mr. McDaniel has no legally protected interest in being invited to witness an execution. I'm worried about whether your argument conflates the merits with standing. When you say legally protected interest, it almost makes it sound like you're saying, because he's not going to win on the merits, he doesn't have standing. And that's certainly not the argument that I intended to make. So let me clarify. A legally protected interest, and I'd return to the Court's example of government benefits, welfare or the sort of thing involved in Matthew v. Eldridge. In that scenario, the government has established an administrative state in which an individual can apply, and if they meet the requirements, they are entitled to the benefits. That would be a legally protected interest. Here, that doesn't exist in terms of whether an individual has some sort of interest in being invited by the director. Now that's different than if an individual is invited by the condemned inmate. That situation was described and explained by the Missouri Supreme Court in State X. Royal Taylor v. Russell. In that case, a condemned man had invited someone who met the statutory criteria, and the director erroneously refused to allow them to attend because that person was a co-defendant in the crime. And the Missouri Supreme Court said, when an individual meets the criteria and is invited by a condemned inmate, the statute says the director shall allow them to attend. Does this man have a legally protected interest in not being excluded based on his viewpoint? So if I understand the court's question, the question is, does Mr. McDaniel have a legally protected interest in not being discriminated against in terms of applying to witness the execution? Well, what I said was that the illegally protected interest did not mean excluded from witnessing execution based on his viewpoint. And the answer in this case, Your Honor, is no. And that's because what the director is doing is carrying out a ministerial duty to send out eight invitations. So the director is not required to accept applications at all. A large portion of the application form is devoted to pedigree information, which the department uses to sort of run background checks on individuals who might pose a threat to institutional security. But tomorrow, the director could eliminate the application form and invite whoever the director wants. Without some sort of statutory or policy or regulatory scheme in which, you know, the legislature says, well, citizens can apply and the director shall consider their applications and invite some of their number. In that scenario, yes, there would be a legally protected interest. But here, because the director, the statute only requires the director to send out eight applications plus the application to the attorney general, there's no legally protected interest. All right. Would you like to save 16 seconds for rebuttal? Yes, Your Honor. You may. Thank you. Mr. Robinson, over to you. May it please the Court. The general rule under Ex parte Young, as this Court said in Skelton against Henry, is that state immunity under the 11th Amendment does not apply to awards of prospective relief. And the reason in bailout that there was reference to enforcement through a civil proceeding is because the statute at issue was enforced through a civil proceeding. But there have been countless cases where this Court and the Supreme Court have considered actions against state officials where there's no enforcement of a civil or criminal proceeding. And several of them are in our briefs, but, you know, Roche against Stouffer, which was the choose life license plates when Missouri wouldn't issue choose life license plate. The defendant was the director of the Department of Revenue and the Joint Committee on Transportation, which implemented the statute and chose what plates would be issued. You know, it wasn't even discussed, but that's an Ex parte Young case because they are enforcing the statute, even though it's not through a criminal proceeding or a civil proceeding. And when that same issue was at the U.S. Supreme Court in Walker against Sons of the Confederacy, Walker was the Texas director of the DMV board that was doing the same thing as Mr. Stouffer was doing, implementing that statute. The Missouri Care Association versus Cross is an example of foster parent reimbursements, where the director of family services was improperly, allegedly improperly, distributing foster parent reimbursements. That was an Ex parte Young case. Randolph versus Rogers, in which this court held that Ex parte Young is available to enforce the ADA, was a deaf inmate suing the Department of Corrections for failing to provide an interpreter. There's no civil or criminal enforcement in those cases as well. Here, the director isn't merely sending out invitations. I think perhaps the statute would allow that. Just send out invitations to whomever you want. Instead, what the Department of Corrections has done indefinitely, or as far back as we know, is take applications. And on those applications, ask a lot of pedigree information, but also ask why you want to observe it in execution, and are you now or have you ever been a member of an organization that takes a view for or against the death penalty. I don't know whether the Director of Precinct is going to do this. It's been an execution since she's been the Director. There was one scheduled that did not go. So my understanding is that the applications are the same. The applications haven't changed. It's a state form. I don't remember the gentleman's name, but the Governor appointed a Board of Inquiry and stayed the execution earlier this year. That's been the only... Yes. Well, I believe that from the perspective of someone, a journalist who wants to apply, nothing has changed. The application form is the same. The discretion given to the Director by the statute is the same. And my understanding is the Department of Corrections still has no policy that in any way constricts the absolute discretion given to the Director. So that's the same. So while the person who is the Director undoubtedly is a different individual and it could change in the future, there's nothing suggesting that it has so far. And I actually would suggest that it's the burden of the party asserting mootness to show that the case has become moot. Generally, that's who carries the burden of showing mootness. And just the possibility, well, I mean, I think even just the confession that nothing has changed yet is enough to avoid a finding of mootness at this point of the case. Certainly... Correct. Or they could change the policy. I mean, that would ultimately be the goal here is to have a policy that in some way constrains the absolute discretion. There is a danger. The application does ask for race. So there is the danger that race-based determinations could be made. Yeah, go ahead. Yeah. Right. Well, we pled... Risk. We pled that he may have been. Yes. So I think the risk is sufficient here under these circumstances where it's not just a statement put out there without support. We pled factually that everyone who stated that the reason that they wanted to attend an execution was to ensure that it was carried out in a constitutional manner. Everyone who asserted that was not selected. We didn't allege viewpoint discrimination without any discovery or without asking, having the opportunity in discovery to ask why specific decisions were made on various applications. So I think... I don't know that we have a factual basis to actually assert that viewpoint discrimination is the reason why he was rejected without more information. But we did allege a factual basis that I think makes a plausible claim that viewpoint discrimination happened to Mr. McDaniel. Right. The relief we're seeking is that the Department of Corrections be required to develop a policy that sets forth criteria, objective criteria, to determine how individuals will be selected to be witnesses. Rather than just giving complete discretion and that those criteria be viewpoint neutral. Rather than just giving complete discretion to the Director of the Department of Corrections. Well, his injury... Right. His injury is not being excluded on the basis of his... His injury is being excluded on the basis of his viewpoint from participation in this program that the Department of Corrections has created. This program... I think that that is what we're pleading, is that he has not had a chance, an equal chance, to apply and have the opportunity to witness an execution because of the discretionary nature of the invitation process. So, the remedy would be similar. It's not that different than Cuffley v. Nickus, which is the roadside cleanup where the Department of Transportation, I think, ran that.  Whoever ran that program was given the opportunity. They could discontinue the program or they could come up with criteria that were objective and did not allow viewpoint discrimination. And that's the same thing we would be looking for here as an ultimate remedy. Right. I don't think that on their own, in the absence of any policy, that there would be a right under the Constitution to observe an execution. But when the procedure has been set up to invite people to apply, I think that creates a right, or at least an opportunity, a benefit that the state is providing and that has to be provided without discrimination. If the state decided to have no one at executions, that might raise some other issue that I'm not familiar with about under the Sixth of the Eighth Amendment, maybe. But it would not be an issue here if there was no one. And it might not even be an invitation, might not even be an issue if the statute specified certain government officials who were supposed to attend. But what has happened here is the Department of Corrections has opened it up to the public and created an invitation process. And there is a right. I don't want to oversell how strong of a right it is. But in the Cuffley case, government benefits are not limited to those that are valuable or even benefits at all, is what this Court said in Footnote 5. So I do think that once the government opens this process, then it has to do it in a viewpoint-neutral manner. How is the state covering litigation with the ACLU constantly? If it wants to allow new members of Congress to go out and choose them, how do you make use of people who serve? Well, one way would be not to have an open or transparent process so that we know what basis decisions are being made. Another could not be to specifically ask about membership in organizations that are for or against the death penalty in the application where you're soliciting information from which to make the decision on who to invite. Another point, does the state have some discretion about which media people to include? President had a press conference and he put one news organization in front of it while the other in the back row because of viewpoint. Is that violating some constitutional right of the media to have a preferred location? I think that even with a policy, I think if the state were to allow media people in and just for instance, never allowed anyone who wrote critically of the death penalty but always allowed people who wrote positively, wrote positive editorials, there could still be viewpoint discrimination in ways that you could show it. But there is going to be ultimately decisions will have to be made about who is accepted and who is not and not everything will rise to the level of where it could be litigated as a claim. But what we're challenging here is not individual decisions but the policy itself and it's the policy itself that provides unfettered discretion. This is pleaded as a due process claim. As often happens, the due process and the First Amendment claim are touched upon one another. Chicago v. Morales is an example of that. It's the process that we're challenging. But the process does allow for viewpoint discrimination and in our view, that is a process that is not due under the 14th Amendment. Well, we have to show an interest. What we're alleging is that there's a government benefit created. Yes. When they open up the application process. It's a government benefit. Like the license plates programs, like the Adopt-the-Road programs. Those talked in terms of valuable government benefits. And our view is that once there's a benefit that has to be, you can't deny it on the basis of viewpoint discrimination. So it's very closely tied to the First Amendment and they both, of course, apply to the 14th Amendment. And I am out of time. Thank you. Yes, Your Honor. And I apologize for misunderstanding the clock. I do want to very quickly clear something up. There have been two executions. One carried out, Mark Christensen, in January. One scheduled but not carried out, Marcellus Williams, in August. It's my understanding that the director, who had only taken office days or a few weeks before January, used the same forms because of a lack of time to implement new policies, and used the forms for the most recent execution because the review has not yet completed. I see that my time has expired. Thank you, Your Honor.